UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CRIMINAL ACTION NO. 24-34-DLB-CJS

UNITED STATES OF AMERICA                                                                                  PLAINTIFF

VS.                                              **MEMORANDUM ORDER**

GENGHIS KHAN STEVENSON                                                                               DEFENDANT

\* \* \* \* \* \* \* \* \* \* \* \*

## I.   INTRODUCTION

This matter is before the Court upon Defendant Genghis Khan Stevenson's Motion to Dismiss the Indictment. (Doc. # 77). In his Motion, Defendant argues that dismissal is warranted because the United States violated the Fifth Amendment by failing to preserve potentially exculpatory evidence. (Doc. # 77-1 at 3). The United States having filed its Response in Opposition (Doc. # 78) and Defendant having failed to file a reply, the matter is ripe for the Court's review. For the following reasons, the Motion is **denied**.

## II.   FACTUAL AND PROCEDURAL BACKGROUND[1]

On March 28, 2024, interdiction agents working at the Cincinnati/Northern Kentucky International Airport ("CVG") learned that Defendant was set to board a one-way flight to Los Angeles later that day. These agents also discovered that Defendant had purchased his ticket the previous day. These facts, combined with Defendant's criminal history involving narcotics offenses, prompted Agents Richard Bernecker and Michael Keller to initiate an encounter with Defendant. Bernecker and Keller, dressed in

---

[1] In the interests of judicial economy, the Court incorporates the findings of fact set forth in its Order dated July 11, 2025 (Doc. # 67).

1

plainclothes and without weapons displayed, waited for Defendant in a corridor in between Gate B15 and the jetway leading to the airplane. After Defendant scanned his boarding pass, Agent Bernecker introduced himself to Defendant and displayed his badge and identification. Agent Bernecker then asked for permission to search Defendant's backpack. Defendant consented to the search and Agent Bernecker discovered over $15,000 in U.S. currency.

Meanwhile, Agent Rob Minter took his K9 companion Brodie to the area where Defendant's checked bag was located. Brodie alerted to the presence of narcotics in Defendant's suitcase. Subsequently, Agent Minter brought the suitcase to the area near Gate B15 and asked Defendant if it belonged to him. Once Defendant identified the suitcase as his own, Agent Minter requested permission to search the suitcase. Again, Defendant consented to the search. Agent Bernecker began to look through the suitcase and, in the process, discovered a brown paper bag which contained pressed white powder. Although Agent Bernecker initially believed the substance was cocaine, after testing, authorities determined the white powder to be approximately 250 grams of fentanyl. After locating the powder, the agents took Defendant into custody.

On July 11, 2024, the grand jury returned an indictment against Defendant. (Doc. # 3). On April 29, 2025, and relevant to this motion, Defendant moved to compel production of video captured by a security camera positioned near Gate B15. (Doc. # 52). The United States opposed Defendant's Motion for two reasons. (Doc. # 56). First, the United States maintained that no security camera was positioned to view the area in which the encounter occurred. (*Id.* at 1). Second, video depicting Gate B15 was not

2

preserved because the encounter occurred outside that camera's view. (*Id.*). The Court denied Defendant's Motion to Compel. (Doc. # 58).

Now, Defendant seeks dismissal of the indictment. Defendant contends (a) that "the interaction between Agent Bernecker and the Defendant was observed by security camera(s) positioned at the gate," (b) that video depicting the interaction would show that the encounter was not consensual, and (c) that the United States' failure to preserve this video violated Defendant's right to Due Process. (Doc. # 77-1 at 2). The United States argues against dismissal because any video created by the security cameras would not have been exculpatory and the United States did not act in bad faith by failing to preserve such video. Rather, CVG automatically deleted the video thirty days after its creation pursuant to CVG's records management policy. (Doc. # 78 at 1).

### III.    ANALYSIS

"Under the Due Process Clause, the Supreme Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). This guarantee sometimes requires the government to take "affirmative steps to preserve evidence on behalf of criminal defendants." *Trombetta*, 467 U.S. at 486. However, the Constitution only requires such affirmative steps with respect to "evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488. Courts evaluating this kind of evidence must distinguish between evidence that was "(1) apparently exculpatory at the time it was destroyed [and] (2) [evidence that was] only 'potentially useful' at the time it was destroyed." *United States v. Folad*, 877 F.3d 250, 253 (6th Cir. 2017) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988)).

3

Failure to preserve material exculpatory evidence "violates due process regardless of the government's good or bad faith." *Id.* (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Evidence is "material" if it had "an exculpatory value that was apparent before the evidence was destroyed" and was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

On the other hand, "where the government fails to preserve evidence whose exculpatory value is indeterminate and only 'potentially useful' to [a] defendant, we apply a different test." *Jobson*, 102 F.3d at 218 (quoting *Youngblood*, 488 U.S. at 57-58). Where a defendant charges the government with a failure to preserve potentially useful evidence, he must show: "(1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* Defendant charges the government with a failure to preserve "potentially exculpatory" evidence. (Doc. # 77-1 at 3). Accordingly, the Court will apply the tripartite *Youngblood* test.

### A. The exculpatory value of the evidence was not apparent prior to its destruction

The Sixth Circuit has acknowledged the "inter-relat[ion]" between the first two requirements—that the government acted in bad faith and that the evidence had apparent exculpatory value. *Jobson*, 102 F.3d at 218. "The presence or absence of bad faith by

4

the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n. *.  Because an evaluation of *Youngblood*'s bad faith prong is influenced by the apparent exculpatory value of the evidence at issue, the Court will first address the apparent exculpatory value of the video.

Defendant argues that, in the absence of video captured by the security camera positioned near Gate B15, "we can never truly know what interaction occurred between Defendant and law enforcement."  (Doc. # 77 at 4).  However, Defendant offers nothing but speculation to establish the exculpatory value of the video.  In its Order (Doc. # 67) denying Defendant's Motion to Suppress (Doc. # 49), the Court determined that Defendant voluntarily consented to a search of his luggage.  (Doc. # 67 at 5).  At the evidentiary hearing on June 24, 2025, the Court heard testimony from Michael Keller and Richard Bernecker, the two officers who encountered Defendant near Gate B15 on March 28, 2024.  (*Id.* at 2).  Both officers testified that Defendant voluntarily stopped to speak with them and freely consented to a search of his luggage.  (Doc. # 73 at 26:23-27:9, 27:21-28:3, 59:25-60:11).  No other witnesses testified at that hearing.  The record evidence suggests that, had it been preserved, the video would not provide the kind of materially exculpatory evidence necessary to justify dismissal.  *See Jobson*, 102 F.2d at 219 (affirming denial of a motion to dismiss where the possibility that an audio recording had exculpatory value was not established).  Accordingly, any video depicting the encounter lacked apparent exculpatory value when CVG automatically purged the footage from its records.

**B. The United States did not act in bad faith**

"In order to establish bad faith, 'a defendant must prove official animus or a conscious effort to suppress exculpatory evidence.'" *United States v. Collins*, 799 F.3d 554, 569 (6th Cir. 2015) (quoting *Jobson*, 102 F.3d at 218)); *see also United States v. Hofstetter*, 31 F.4th 396, 430 (6th Cir. 2022), *cert. granted, judgment vacated on other grounds*, 143 S.Ct. 351 (2022) (mem.) (finding "no suggestion of animus" where government did not review the content of the files before they were destroyed, the government did not suspect the files to be exculpatory, and the destruction occurred as a part of a "standard, state-mandated file closure process").

Here, nothing in the record indicates that anyone—the CVG Police department, the federal interdiction officers involved in the encounter with Defendant, or the U.S. Attorney's office—suspected that footage from the security camera would offer exculpatory evidence. (*See* Doc. # 73 at 11:24-12:4). Indeed, the United States maintains that no security camera was positioned to capture the area in which the federal interdiction officers encountered Defendant and searched his luggage. (*Id.*). Further, any video footage recorded by the security cameras was deleted automatically thirty days after its recording pursuant to CVG's records management policy, rather than at the behest of the United States. (Doc. # 77-1 at 3). In line with this policy, CVG automatically deleted the footage from March 28, 2024 on or around April 28, 2024. (*See id.*). Defendant was not indicted until July 11, 2024—seventy-four days after CVG automatically deleted the footage from March 28, 2024. (Doc. # 3).

Defendant argues that the United States should have asked CVG to preserve the footage immediately after the interdiction agents' encounter with Defendant on March 28,

6

2024. (Doc. # 77-1 at 4). However, as discussed above, there is no evidence that anyone at the U.S. Attorney's office or the officers involved even suspected that the video was exculpatory. *See United States v. Mooney*, 135 F.4th 486, 499 (6th Cir. 2025) (holding that the government did not act in bad faith when it allowed a video to be erased as part of a routine policy and no one believed the video to be exculpatory). Therefore, Defendant has not demonstrated the kind of "official animus" or "conscious effort to suppress exculpatory evidence" required for a finding of bad faith. *Jobson*, 102 F.3d at 218.

### C. Defendant can obtain comparable evidence

Defendant also fails to satisfy the third factor. Defendant must show that the nature of the video was such that he is "unable to obtain comparable evidence by other reasonably available means." *Jobson*, 102 F.3d at 218 (citing *Youngblood*, 488 U.S. at 57-58 and *Trombetta*, 467 U.S. at 488-89). The Sixth Circuit has held that eyewitness testimony and cross-examination of the government's witnesses constitute "comparable evidence" to audio and video recordings. *See Elmore v. Foltz*, 768 F.2d 773, 778 (6th Cir. 1985) (noting that "all that matters is that some reasonable alternative means exists for attempting to do what one would have attempted to do with the destroyed evidence"); *United States v. Gaither*, 65 F. App'x. 514, 517 (6th Cir. 2003) (finding that cross-examination of the government's witnesses provided comparable evidence to a missing audiotape); *see also United States v. Toran*, No. 1:19-cr-86, 2021 WL 4313879, at *8 (S.D. Ohio Sep. 9, 2021) (finding that a defendant had access to evidence comparable to video of a traffic stop where he could call the officer involved to testify at trial).

Here, Defendant has access to comparable evidence to the video. He can call Agent Bernecker or Agent Keller to testify as to the encounter. Likewise, Defendant may

7

cross-examine these Agents if the government calls them as witnesses. Further, Defendant can take the stand himself and testify concerning the encounter. While video evidence may offer a superior tool to impeach the Agents' testimony, it is not the only tool. *Elmore*, 768 F.2d at 778. Because these forms of comparable evidence are available to Defendant, he fails to establish the final *Youngblood* factor.

### IV.   CONCLUSION

For the reasons stated herein, the Court declines to dismiss the indictment because the United States did not violate Defendant's right to Due Process by failing to preserve security camera video created on March 28, 2024. Accordingly,

**IT IS ORDERED** that Defendant Genghis Khan Stevenson's Motion to Dismiss the Indictment (Doc. # 77) is **DENIED.**

This 24th day of October, 2025.

Signed By:
David L. Bunning
Chief United States District Judge